**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| OFFICE PROPERTIES INCOME TRUST, *et al.*, | Case No. 25-90530 (CML) |
| Debtors.[1] | (Jointly Administered) |
| OFFICE PROPERTIES INCOME TRUST, *et al.*, | Adversary Proc. No. 25-_____ (___) |
| Plaintiffs, | |
| v. | |
| UMB BANK, NATIONAL ASSOCIATION, | |
| Defendant. | |

## <u>DECLARATORY JUDGMENT COMPLAINT</u>

Plaintiffs Office Properties Income Trust ("***OPI***" or the "***Company***") and the additional subsidiaries identified below (collectively, "***Plaintiffs***"), as debtors and debtors-in-possession, having commenced cases (collectively, the "***Chapter 11 Cases***") for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"), file this adversary complaint (the "***Complaint***"), pursuant to 28 U.S.C. §§ 2201, 2202, Rule 7001(9) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), and section 502(b)(2) of the Bankruptcy Code, seeking declaratory judgment relief against UMB Bank, National Association, as indenture trustee

---

[1]   A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/OPI.  The Debtors' mailing address is Two Newton Place, 255 Washington Street, Suite 300, Newton, Massachusetts 02458-1634.

and collateral agent for the 2027 Notes (as defined below) (the "***Trustee***" or "***Defendant***").  As the basis for the Complaint, Plaintiffs state as follows:

## NATURE OF THE ACTION

1.     Facing significant near-term debt maturities, lack of access to capital, and a challenging market environment, in December 2024, OPI entered into a private debt-for-debt transaction in which, in essence, OPI issued new notes with a face amount of $445 million due in 2027 (the "***2027 Notes***") in exchange for $340 million in cash and unsecured notes due in 2025 (the "***2025 Notes***").

2.     The exchanging noteholders benefited from OPI's distress and the impending maturity.  Specifically, the exchanging noteholders gave up $282 million of 2025 Notes and $58 million in cash in return for $445 million of 2027 Notes, 11.5 million shares of OPI common stock, a total of $10 million in support premium payments, $4.6 million in cash for accrued interest on the 2025 Notes, and, for certain backstopping noteholders, a total of $15 million of backstop premium payments (the "***December 2024 Exchange***").  That exchange generated roughly $135 million in original issue discount ("***OID***").

3.     The exchanging noteholders advised OPI that they intend to pursue recovery of all OID in the Chapter 11 Cases, including unamortized OID that constitutes disallowable unmatured interest under section 502(b)(2) of the Bankruptcy Code.  Knowing that the 2027 Notes were vulnerable to an OID disallowance challenge, some of the exchanging noteholders purported to accelerate their 2027 Notes, claiming that an Event of Default occurred as of 11:00 a.m. ET on October 30, 2025.  OPI responded that same day, explaining that any such notice was premature and ineffective because the 30-day contractual grace period for the September 30, 2025 interest payment did not expire until 11:59 p.m. ET on October 30 (which, of course, was after these

Chapter 11 Cases were commenced).  OPI has heard nothing further from those noteholders regarding any Event of Default or acceleration.

4.      Plaintiffs seek a judgment declaring that the unamortized original issue discount (OID) as of the Petition Date associated with the December 2024 Exchange must be disallowed, as unmatured interest under section 502(b)(2) of the Bankruptcy Code, from any claim filed by the Trustee on behalf of the exchanging noteholders.

5.      Plaintiffs also seek a judgment declaring that, by filing or prosecuting this Complaint, which seeks only to disallow unmatured interest that the Trustee intends to claim, Plaintiffs have not waived or released, and will not be precluded from later asserting in this action or any future action or proceeding, any estate claim or cause of action arising out of the December 2024 Exchange or otherwise relating to the facts and circumstances alleged herein.

6.      The prompt resolution of this disputed issue is critical to determining the proper statement of claims and ensuring the integrity of the claims process, the avoidance of any risk that milestones under the Restructuring Support Agreement and debtor-in-possession financing may be breached or not satisfied in a timely manner, and the equitable treatment of creditors in the Chapter 11 Cases.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.  This is a core proceeding under 28 U.S.C. § 157(b) because the action arises in and relates to a case under chapter 11 of the Bankruptcy Code.

8.      Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

9.      This adversary proceeding is commenced pursuant to Rule 7001(9) of the Bankruptcy Rules, which allows for proceedings to obtain a declaratory judgment, and section 105(a) of title 11 of the Bankruptcy Code.  Declaratory relief is appropriate pursuant to

Rule 7001 of the Bankruptcy Rules and 28 U.S.C. § 2201.  The requested declaration is necessary to determine the parties' rights and aid efficient administration of the Chapter 11 Cases.

10.     Pursuant to Rule 7008 of the Bankruptcy Rules, Plaintiffs consent to the entry of a final judgment or order with respect to this Complaint if it is determined that this Court, absent consent of the parties, cannot enter a final order or judgment consistent with Article III of the United States Constitution.

## PARTIES

11.     OPI is a Maryland real estate investment trust ("**REIT**") formed in 2009 under Maryland law with its principal place of business in Newton, Massachusetts.  OPI is one of the Debtors in the Chapter 11 Cases.

12.     In addition to OPI, certain subsidiaries of OPI—each of which is a Debtor in these Chapter 11 Cases and provided certain guarantees in connection with the December 2024 Exchange—are joined as Plaintiffs (the "**2027 Notes Guarantors**").[2]

13.     Upon information and belief, the Trustee (as successor to U.S. Bank Trust Company N.A.) represents the holders and/or beneficial owners of the 2027 Notes, who are expected to assert claims in the Chapter 11 Cases that include unamortized OID arising from the December 2024 Exchange.

---

[2]     The secured parties among the 2027 Notes Guarantors are: SIR Campbell Place Inc., Bayside Pkwy Fremont 2 LLC, SIR San Jose LLC, FP 11 Dupont Circle, LLC, FP 1401 K, LLC, Government Properties Income Trust LLC, GPT Properties Trust, Grand Oak Circle Tampa LLC, GPT Properties LLC, OPI 25 Exchange LLC, FP 6315 Hillside Center, LLC, FP Patuxent Parkway, LLC, FP Redland Technology Center LLC, FP 540 Gaither, LLC, SIR Parsippany (Jefferson) LLC, SIR Philadelphia LLC, SIR Irving (Freeport) LLC, SIR REIT New Braunfels LLC, and FP Atlantic Corporate Park, LLC.

The unencumbered parties among the 2027 Notes Guarantors are: ACP East LLC, FP 1211 Connecticut Avenue, LLC, FP 1775 Wiehle Avenue, LLC, FP 6310 Hillside Center, LLC, FP 840 First Street, LLC, GOV Lake Fairfax Inc., GOV Lakewood Properties Trust, OPI AL Properties LLC, SIR Centennial LLC, SIR Fort Mill LLC , SIR Johnston LLC, SIR Omaha LLC. SIR Properties REIT LLC, SIR Properties Trust, SIR Redwood City LP, SIR REIT Plano LLC, SIR Holdings Corporation, Primerica Holdco LLC, Ewing Holdco LLC, SIR Redwood City LLC, First Potomac DC Holdings, GOV NEW OPPTY LP, OPI TRS Inc., FP Sterling Park Land, LLC, 20 Mass Ave TRS Inc., SC Merger Sub LLC, CRI SIR LLC, SIR Operating Partnership LP.

## FACTUAL BACKGROUND

### A.    Overview of OPI and Its Capital Structure[3]

14.    OPI is a publicly traded REIT focused on owning and leasing office properties to high-credit-quality tenants across the United States.  As of the Petition Date, OPI owned more than 124 properties comprising approximately 17.2 million rentable square feet, with a tenant base that includes a significant proportion of investment-grade-rated entities.  OPI is managed by The RMR Group, a leading U.S. alternative asset management company that focuses on commercial real estate.

15.    Prior to the December 2024 Exchange, OPI's capital structure consisted of several tranches of debt, including the 2025 Notes.  As of late 2024, the impending maturity of the 2025 Notes created liquidity and refinancing challenges for OPI in a difficult commercial real estate and capital markets environment.

16.    Throughout 2023 and 2024, OPI, in consultation with its advisors, closely monitored the Company's liquidity position and the broader market for office properties, which continued to be adversely affected by remote work trends, rising interest rates, and constrained access to capital.  OPI did not have the cash to repay the 2025 Notes by their maturity, and OPI had limited access to alternative refinancing options.  The Company's ability to refinance or repay the 2025 Notes in full was further complicated by tightening credit conditions in the broader financial market, declining property valuations, and its covenants under its other debt instruments.

---

[3]    A more detailed description of the factual background regarding the Debtors, including their properties, their capital structure, and the events leading to the commencement of the Chapter 11 Cases is set forth in the *Declaration of John Castellano in Support of Chapter 11 Petitions and First Day Relief* (the "***First Day Declaration***") filed on the Petition Date in the Chapter 11 Cases.  Capitalized terms used but not otherwise defined herein have the meaning assigned to them in the First Day Declaration.

17.     As a result, OPI engaged in discussions with certain noteholders and their financial advisors to explore liability management alternatives.  The Company's objectives were to extend its debt maturities, reduce near-term refinancing risk, and preserve liquidity to support ongoing operations.  After evaluating various options, OPI determined that a debt-for-debt exchange transaction would provide the most effective means of addressing its capital structure challenges while minimizing disruption to its business and stakeholders.

**B.     Terms of the December 2024 Exchange**

18.     On December 11, 2024, OPI, as issuer, entered into a private exchange agreement with certain holders of OPI's 2025 Notes (the "***Exchange Agreement***"), a copy of which is attached as **Exhibit A**.

19.     The Exchange Agreement was designed to address OPI's near-term debt maturities, provide additional runway for the Company to manage its capital structure, and avoid a default or distressed refinancing.

20.     Pursuant to the Exchange Agreement, participating noteholders agreed to exchange $340 million in 2025 Notes (or in cash to the extent the amount of 2025 Notes fell short of $340 million) for $445 million in 2027 Notes plus OPI stock and cash premiums.  OPI offered this increased principal, common stock, and premiums to incentivize participation in the December 2024 Exchange because it lacked alternatives to extend its looming debt maturity dates.

21.     Before the Exchange Agreement was announced, the 2025 Notes were trading at roughly $870 per $1,000 of face amount.  The trading price increased to close to par on the heels of the Exchange Agreement announcement, and a substantial majority of the 2025 noteholders accepted the Exchange Agreement and participated in the December 2024 Exchange (the "***Exchange Noteholders***").

22.     The terms of the Exchange Agreement provided that the Exchange Noteholders could surrender up to $340 million in 2025 Notes.  If the principal amount of 2025 Notes exchanged was less than $340 million, certain Exchange Noteholders agreed to backstop the exchange in cash so that the full $340 million in consideration from the Exchange Noteholders was received by OPI (the "***Backstop Commitment Parties***").

23.     At the end of the day, the Exchange Noteholders gave up, and OPI received, 2025 Notes with a face value of approximately $282 million and roughly $58 million in backstopped cash, totaling $340 million per the terms of the Exchange Agreement.

24.     Conversely, OPI gave up, and the Exchange Noteholders received, 2027 Notes with a face value of approximately $445 million plus other economic benefits, as described below.

25.     The 2027 Notes received by the Exchange Noteholders bear stated interest at a rate of 3.25% per annum, payable quarterly, and require quarterly principal amortization of $6.5 million, with a mandatory principal repayment of $125 million due on March 1, 2026, unless satisfied earlier with proceeds from specified asset sales.

26.     The 2027 Notes issued by OPI and received by the Exchange Noteholders are guaranteed by certain of the 2027 Notes Guarantors, and secured by first-priority liens on 35 properties of those subsidiaries.  The Exchange Noteholders also received second-priority liens on 19 additional properties that also secure OPI's senior secured notes due in 2029.

27.     The Exchange Noteholders also received: (i) 11.5 million shares of OPI common stock valued at roughly $15.76 million using a price per share of $1.37 (the closing price on December 11, 2024, the date of the exchange); (ii) a $10 million support premium, allocated among those noteholders; and (iii) $4.6 million of accrued interest on the 2025 Notes.

28.     The Backstop Commitment Parties received a $15 million premium for agreeing to serve as backstop purchasers of the 2027 Notes, to the extent the face amount of 2025 Notes surrendered by the Exchange Noteholders fell below $340 million.

**C.     Methodology Used to Calculate Issue Price and Total OID**

29.     The 2027 Notes were issued at a significant discount to face value.  For accounting and tax purposes, this discount is recognized as OID, which represents the difference between the stated principal amount of the new notes and the value of the consideration received by the issuer in the exchange.

30.     The methodology OPI used to ascertain the issue price and corresponding OID on the 2027 Notes at issuance was based on the components of the exchange consideration as reflected in the agreed tax treatment of the surrender of 2025 Notes (or payment of cash by the Backstop Commitment Parties) in exchange for 2027 Notes, OPI common stock, and cash, as set forth in section 13(b) of the Exchange Agreement (collectively, the "***Exchange Tax Treatment Covenants***").  OPI used the Exchange Tax Treatment Covenants, in conjunction with the Treasury Regulations issued under sections 1272-1273 of the Internal Revenue Code, to determine issue price and OID based on its view that its determination was the most appropriate under applicable tax law.  All Exchange Noteholders consented to those covenants and the tax treatment they produced by accepting the Exchange Agreement and participating in the December 2024 Exchange.

31.     Specifically, using the Exchange Tax Treatment Covenants, OPI calculated the OID in the December 2024 Exchange for federal income tax purposes by applying the rules for determining OID prescribed under sections 1272-1273 of the Internal Revenue Code and the applicable Treasury Regulations.

32.     OPI first determined the 2027 Notes' issue price, which for U.S. federal income tax purposes was controlled by the cash consideration paid and the consideration received by the Backstop Commitment Parties.

33.     Using the Exchange Tax Treatment Covenants, OPI determined the issue price per $1,000 of face amount of the 2027 Notes by first dividing each $1,000 paid by the overall ratio of the face amount of the 2027 Notes to be issued over the face amount of the 2025 Notes to be surrendered in exchange ($445 million over $340 million, or approximately 1.30882).

34.     The result of that calculation is that the Backstop Commitment Parties received $1,308.82 of 2027 Notes for every $1,000 they paid in cash.  Put differently, the Backstop Commitment Parties paid $764.05 for every $1,000 face amount of 2027 Notes they received before any other adjustments required by the Exchange Tax Treatment Covenants and applicable Treasury Regulations.

35.     The Exchange Agreement requires certain adjustments to those cash amounts paid by the Backstop Commitment Parties to arrive at the issue price for the 2027 Notes.  One adjustment is the allocation of a portion of the amount paid per $1,000 face amount of 2027 Notes to the value of the shares received along with the 2027 Notes (approximately 25.916 shares per $1,000 face amount of 2027 Notes, worth approximately $35.51 at a closing date closing value per share of $1.37).  Also, the Exchange Agreement provides that, for tax purposes, the amount of the backstop premium payment allocable to the exercised portion of the December 2024 Exchange would reduce the issue price of the 2027 Notes and stock purchased for cash in the exchange (approximately $33.71 per $1,000 face amount of 2027 Notes).

36.     Accordingly, OPI followed the Exchange Tax Treatment Covenants by subtracting an allocable portion of the amount of the backstop premium received by the Backstop Commitment

Parties from the issue price calculation, net of the portion of the allocable premium attributable to the stock received (approximately $1.57 per $1,000 face amount of 2027 Notes), so that the ultimate issue price is solely attributable to the 2027 Notes themselves.  That process resulted in an issue price for the 2027 Notes of $696.40 per $1,000 face amount of 2027 Notes.

37.     After arriving at the issue price per $1,000 of 2027 Notes, OPI calculated the aggregate issue price by multiplying the face amount of the 2027 Notes ($444.99 million) by that issue price (0.6964).   That resulted in an aggregate issue price of the 2027 Notes equal to $309.89 million.

38.     After arriving at the aggregate issue price, OPI next determined total OID at issuance by taking the difference between the face amount of the 2027 Notes ($444.99 million) and the aggregate issue price ($309.89 million), to arrive at total OID equal to $135.1 million.

**D.     Method Used to Calculate OID as of Petition Date**

39.     After arriving at total OID, OPI used the constant yield method to determine the unamortized portion of OID as of the Petition Date (the "***Constant Yield Method***"), which is the standard method of determining OID under the Internal Revenue Code and applicable Treasury Regulations.

40.     The Constant Yield Method required OPI to use the issue price and the projected schedule of payments on the 2027 Notes to determine a constant yield to maturity on the 2027 Notes.  A constant yield to maturity is the implicit interest rate that would account for all of the projected payments on the 2027 Notes in light of the issue price as determined by OPI.

41.     OPI then used this constant yield to accrue OID from the issue date of the 2027 Notes, which led to approximately $76.4 million of unamortized OID on the 2027 Notes as of the Petition Date.

**E.     Certain Holders of the 2027 Notes Purport To Accelerate The Debt**

42.     On October 30, 2025, certain holders of the 2027 Notes delivered a notice purporting to declare an Event of Default as of 11:00 a.m. that day and to accelerate the 2027 Notes based on an alleged failure to pay interest due September 30, 2025.  *See* Ex. B, Oct. 30 Notice of Acceleration.

43.     OPI promptly rejected that notice in writing as premature and ineffective.  *See* Ex. C, Oct. 30 Rejection of Notice of Acceleration.

44.     Under the Exchange Agreement, an interest-payment default does not ripen into an Event of Default unless it "continues for a period of 30 days," and acceleration is permitted only upon the occurrence and continuance of an Event of Default.  Ex. A, Exchange Agreement §§ 5.01(b), 5.02.  The 30-day grace period for any September 30, 2025 interest default ran through midnight on October 30, 2025.  OPI commenced the Chapter 11 Cases before that cure period expired.  Accordingly, no Event of Default was then occurring, and the October 30 acceleration notice was ineffective.

**F.     Special Committee Investigation—Reservation of Rights**

45.     OPI's board has appointed an independent and disinterested Special Committee to evaluate all potential claims and causes of action owned by the Debtors' estates.

46.     Notably, among other claims and causes of action, the Special Committee's mandate includes the evaluation of all potential claims and causes of action of OPI arising out of the December 2024 Exchange or otherwise relating to the facts and circumstances alleged herein. OPI expressly reserves all of those claims, whether arising under 11 U.S.C. §§ 544, 547, 548, 550, and 551 and applicable state fraudulent transfer (actual or constructive) or voidable transaction laws, and whether relating to the December 2024 Exchange or any other transaction involving

OPI, as well as any related claims for disallowance, recharacterization, equitable subordination, or other legal or equitable relief (the "***Reserved Estate Claims***").

47.     Rather than rush—or await—the Special Committee's conclusions, OPI believes that adjudicating this discrete claims-allowance issue now will promote efficiency and economy in the Chapter 11 Cases.  But OPI—and the Special Committee's process—should not be prejudiced by doing what is in the best interests of the administration of the Chapter 11 Cases, which is to commence this adversary proceeding at this time.

48.     To be clear, by filing and prosecuting this action, which seeks only to disallow unmatured interest that the Trustee intends to claim, OPI does not intend to waive or release any of the Reserved Estate Claims.  Likewise, OPI does not intend to be precluded from asserting any of the Reserved Estate Claims—and fully litigating all issues related thereto—in this action or any subsequently filed action or proceeding.

## COUNT ONE

### (Declaratory Judgment Pursuant to 28 U.S.C. § 2201 and 11 U.S.C. § 502(b)(2))

49.     The allegations set forth above are incorporated by reference as if fully set forth herein.

50.     A real and justiciable controversy exists.  Plaintiffs maintain that the Exchange Noteholders received OID in connection with the December 2024 Exchange, and that the unamortized portion of that OID as of the Petition Date must be disallowed from the Trustee's claim as unmatured interest.  The Exchange Noteholders disagree and have advised Plaintiffs that they believe they are owed and will seek to recover through the Chapter 11 Cases the full face value of the 2027 Notes, including all associated OID.

51.     To resolve that controversy in an efficient and economical manner, Plaintiffs respectfully request judgment declaring that: (a) the issue price per $1,000 of 2027 Notes, the aggregate issue price in connection with the 2027 Notes, and the total OID generated upon issuance of the 2027 Notes shall be determined at an evidentiary hearing before the Court using the Exchange Tax Treatment Covenants in conjunction with applicable Treasury Regulations; (b) the unamortized portion of such total OID as of the Petition Date shall be determined at an evidentiary hearing before the Court using the Constant Yield Method, and such amount shall be disallowed from the Exchange Noteholders' claim as unmatured interest pursuant to section 502(b)(2) of the Bankruptcy Code; and (c) by bringing and prosecuting this adversary proceeding, Plaintiffs have not waived or released any of the Reserved Estate Claims, and they are not precluded from asserting any such claims and fully litigating all issues related thereto in this or any subsequent action or proceeding should they wish to do so.

52.     Plaintiffs have no adequate remedy at law for the declaratory relief they seek here, and such relief is necessary to resolve this controversy and facilitate the fair administration of the Debtors' estates.

53.     This controversy is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act.  28 U.S.C. §§ 2201-2202.  A timely declaration is necessary to assist in the claims-allowance process.

54.     Pursuant to 28 U.S.C. §§ 2201-2202, this Court has broad authority and discretion to declare the rights and legal relations of the parties, including on an expedited basis.

55.     The prompt resolution of this controversy is necessary to, among other things, "determine the validity, priority, or extent of a lien or other interest in property" of the Debtors, pursuant to Bankruptcy Rule 7001(2).

56.    No statutory, equitable, or other exception to the disallowance of unmatured interest applies to the unamortized OID under the 2027 Notes as of the Petition Date.

*[Remainder of Page Intentionally Left Blank]*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment declaring that:

(a)     The issue price per $1,000 of 2027 Notes, the aggregate issue price in connection with the 2027 Notes, and the total OID generated upon issuance of the 2027 Notes shall be determined at an evidentiary hearing before the Court using the Exchange Tax Treatment Covenants and applicable Treasury Regulations;

(b)     The unamortized portion of the total OID generated by the issuance of the 2027 Notes, as of the Petition Date, shall be determined at an evidentiary hearing before the Court using the Constant Yield Method, and such amount shall be disallowed from the Exchange Noteholders' claim as unmatured interest pursuant to section 502(b)(2) of the Bankruptcy Code;

(c)     By bringing and prosecuting this adversary proceeding, Plaintiffs have not waived or released any of the Reserved Estate Claims, and they are not precluded from asserting any such claims and fully litigating all issues related thereto in this or any subsequent action or proceeding should they wish to do so; and

(d)     Plaintiffs are entitled to such other and further relief as the Court deems just and proper.

Dated:  November 2, 2025          Respectfully submitted,
        Houston, Texas

                                  */s/ Ray C. Schrock*
                                  **LATHAM & WATKINS LLP**
                                  Ray C. Schrock (NY Bar No. 4860631)
                                  Andrew M. Parlen (NY Bar No. 5370085)
                                  Anupama Yerramalli (NY Bar No. 4645859)
                                  Joseph Serino, Jr. (NY Bar No. 2407492)
                                  Amy C. Quartarolo (CA Bar No. 222144)
                                  Jooyoung Yeu (NY Bar No. 5117429)
                                  1271 Avenue of the Americas
                                  New York, NY 10020
                                  Telephone: (212) 906-1200
                                  Email:   ray.schrock@lw.com
                                           andrew.parlen@lw.com
                                           anu.yerramalli@lw.com
                                           joseph.serino@lw.com
                                           amy.quartarolo@lw.com
                                           jooyoung.yeu@lw.com

                                  *Proposed Attorneys for the Debtors*
                                  *and Debtors in Possession*