**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| OFFICE PROPERTIES INCOME TRUST, *et al.*, | Case No. 25-90530 (CML) |
| Debtors.[1] | (Jointly Administered) |

| | |
|---|---|
| OFFICE PROPERTIES INCOME TRUST *et al.*, | |
| Plaintiffs, | |
| v. | Adversary Proc. No. 25-03802 (CML) |
| UMB BANK, NATIONAL ASSOCIATION, | |
| Defendant. | |

**DEFENDANTS' JOINT MOTION TO DISMISS**

[Relates to Docket No. 1]

---

[1] A complete list of the Debtors in the Chapter 11 Cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/OPI. The Debtors' mailing address is Two Newton Place, 255 Washington Street, Suite 300, Newton, Massachusetts 02458-1634.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ................................................................................................. 7

    A. OPI and its prepetition refinancing transactions. ..................................... 7

    B. The December 2024 Exchange and the 2027 Notes. .................................. 8

    C. The prepetition acceleration notice ...................................................... 10

    D. This adversary proceeding. ................................................................ 11

ARGUMENT ................................................................................................... 13

I.      The 2027 Notes were validly accelerated before the petition date. .............. 14

    A.      The contractual language specifies that the cure period would last for 30 days, not 30.54 days.…..................................................................................................... 14

    B.      Plaintiffs improperly try to divorce the Indenture from the Notes. ................ 17

II.    The complaint fails to state a claim for disallowance under section 502(b)(2). ......... 19

    A.      The December 2024 Exchange did not create OID as a matter of bankruptcy law. ....... 20

    B.      Plaintiffs fail to allege the insolvency of the 2027 Note Obligors. ................... 29

III.   The request to be relieved from *res judicata* should be rejected. ................... 32

CONCLUSION ................................................................................................ 34

## <u>TABLE OF AUTHORITIES</u>

**Cases**  **Page(s)**

*Achee Holds., LLC v. Silver Hill Fin., LLC,*
  342 F. App'x 943 (5th Cir. 2009) ..................................................................... 25

*In re AMR Corp.,*
  485 B.R. 279 (Bankr. S.D.N.Y. 2013), ............................................................ 18

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (2009) .................................................................................... 13

*Bank of N.Y. Mellon v. Riley,*
  2022 WL 1773364 (5th Cir. June 1, 2022) ....................................................... 32

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................. 13, 31

*Block v. Mansfeld Mining & Smelting Co.,*
  23 F. Supp. 700 (E.D.N.Y. 1938) ..................................................................... 18

*In re Chateaugay,*
  109 B.R. 51 (Bankr. S.D.N.Y. 1990) ................................................................ 24

*Cimontubo-Tubagens E Soldadura LDA v. Petroleos De Venez., S.A.,*
  2021 WL 2460291 (S.D.N.Y. June 17, 2021) ................................................... 18

*In re Craddock-Terry Shoe Corp.,*
  91 B.R. 392 (Bankr. W.D. Va. 1988) ................................................................ 17

*Decker v. Advantage Fund, Ltd.,*
  362 F.3d 593 (9th Cir. 2004) ........................................................................... 24

*In re Firestar Diamond, Inc.,*
  654 B.R. 836 (Bankr. S.D.N.Y. 2023) .............................................................. 30

*Frank B. Hall & Co. of N.Y. v. Orient Overseas Assocs.,*
  48 N.Y.2d 958 (1979) ...................................................................................... 16

*Gen. Land Off. v. Biden,*
  71 F.4th 264 (5th Cir. 2023) ............................................................................ 32

*Golden Triangle Vein Ctr. v. Total Body Contouring Inc.,*
  2018 WL 1527841 (N.D. Miss. Mar. 28, 2018) ................................................ 22

*Howe v. Vaughan (In re Howe),*
  913 F.2d 1138 (5th Cir. 1990) ......................................................................... 32

*Int'l Fid. Ins. Co. v. Cnty. of Rockland,*
  98 F. Supp. 2d 400 (S.D.N.Y. 2000) ................................................................ 16

*Ledesma ex rel. Ledesma v. Dillard Dep't Stores, Inc.*,
    818 F. Supp. 983 (N.D. Tex. 1993) ............................................................................. 31

*LTV Corp. v. Valley Fidelity Bank & Trust Co. (In re Chateaugay Corp.)*,
    961 F.2d 378 (1992) ........................................................................................... *passim*

*MacMillan Bloedel Ltd. v. Flintkote Co.*,
    760 F.2d 580 (5th Cir. 1985) ..................................................................................... 14

*Malbone Garage v. Minkin*,
    272 A.D. 109 (1947) .................................................................................................... 15

*Mastrovincenzo v. City of New York*,
    435 F.3d 78 (2d Cir. 2006) ......................................................................................... 19

*Norris v. Hearst Tr.*,
    500 F.3d 454 (5th Cir. 2007) ..................................................................................... 14

*Official Committee of Unsecured Creditors v. UMB Bank, N.A. (In re Residential
    Capital, LLC)*,
    501 B.R. 549 (Bankr. S.D.N.Y. 2013) ........................................................ 21, 22, 26, 28

*PayServices Bank v. Fed. Rsrv. Bank of S.F.*,
    2024 WL 1347094 (D. Idaho Mar. 30, 2024) ............................................................ 22

*In re Pearl Res. LLC*,
    645 B.R. 530 (Bankr. S.D. Tex. 2022) ...................................................................... 30

*Pfizer Inc. v. U.S. Dep't of Health & Hum. Servs.*,
    2021 WL 4523676 (S.D.N.Y. Sept. 30, 2021) ......................................................... 15

*Rios v. City of Del Rio*,
    444 F.3d 417 (5th Cir. 2006) ..................................................................................... 30

*In re Texaco, Inc.*,
    668 B.R. 1 (Bankr. S.D.N.Y. 2025) ........................................................................... 19

*Texas Commerce Bank, N.A. v. Licht (In re Pengo Industries, Inc.)*,
    962 F.2d 543 (5th Cir. 1992) ................................................................................. *passim*

*Thompson v. Mun. Credit Union*,
    2022 WL 2717303 (S.D.N.Y. July 13, 2022) ..................................................... 16, 18

*Ultra Petroleum Corp. v. Ad Hoc Comm. of Opco Unsecured Creditors (In re Ultra
    Petroleum Corp.)*,
    51 F.4th 138 (5th Cir. 2022) ..................................................................................... 29

*Uranga v. Geib (In re Paso Del Norte Oil Co.)*,
    755 F.2d 421 (5th Cir. 1985) ..................................................................................... 24

*Villarreal v. Wells Fargo Bank, N.A.*,
    814 F.3d 763 (5th Cir. 2016) ..................................................................................... 30

*Walker v. Beaumont Indep. Sch. Dist.*,
   938 F.3d 724 (5th Cir. 2019) ........................................................................................ 13

*Waterford Twp. Police v. Mattel, Inc.*,
   321 F. Supp. 3d 1133 (C.D. Cal. 2018) ....................................................................... 23

*Weeks Marine, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*,
   511 F. App'x 78 (2d Cir. 2013) ................................................................................... 18

*Welsh v. Hester*,
   2025 WL 1410009 (5th Cir. May 15, 2025) ................................................................ 32

*United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*,
   336 F.3d 375 (5th Cir. 2003) ....................................................................................... 13

*In re Wotkyns*,
   274 B.R. 690 (Bankr. S.D. Tex. 2002) ........................................................................ 34

**Statutes and Rules**

Bankruptcy Code section 502(b)(2) ............................................................................... *passim*

Federal Rule of Bankruptcy Procedure 9011 .......................................................... 5, 31

Federal Rule of Bankruptcy Procedure 7012 .......................................................... 1, 13

Federal Rule of Civil Procedure 12(b)(6) ...................................................................... 13

Defendant UMB Bank, N.A., in its capacities as Indenture Trustee and Collateral Agent for the 3.250% senior secured notes due March 2027 (the "Notes" or "2027 Notes"), under the Indenture dated December 11, 2024 (as subsequently amended, supplemented or modified from time to time, the "Indenture"), and intervenor-defendant the Ad Hoc Group of 2027 Noteholders (the "2027 Ad Hoc Group," and together with UMB Bank, N.A, the "Defendants") hereby move to dismiss the complaint under Federal Rule of Bankruptcy Procedure 7012. In support of this motion, Defendants respectfully state as follows:

## PRELIMINARY STATEMENT

1.      This action is the so-called "2027 Senior Secured Notes Claims Challenge," a claim-objection campaign the September 2029 Ad Hoc Group required the Debtors to commence under their restructuring support agreement ("RSA") and debtor-in-possession financing facility ("DIP"). It is aimed at recharacterizing a portion of Defendants' claims as "unmatured interest" under section 502(b)(2) of the Bankruptcy Code, based on allegations of the existence of original issue discount ("OID"). Plaintiffs' aim is simple: reduce Defendants' claims and force them to recover only from the Debtor entities that pledged assets to them on a first-lien basis (the "2027 First-Lien Obligors"), and not from other Debtor entities that are co-liable on the Notes on an unsecured basis (the "2027 Unsecured Obligors").[2] Plaintiffs hope to siphon the value of these 2027 Unsecured Obligors away from the 2027 Noteholders (and other structurally senior creditors of these Debtors) for the benefit of their equity owner, the parent-level Debtor, which then is expected to issue new equity to the September 2029 Noteholders in an equitizing plan on dilutive terms—thus delivering to this constituency the lion's share of the value of Debtor entities

---

[2]     Throughout this brief, the term "2027 Note Obligors" refers to the Debtor entities that are obligors on the  2027 Notes.

against which it had no prepetition claims. This litigation strategy fails at the threshold for multiple reasons, and so the complaint must be dismissed.

2.      ***Acceleration***. As Plaintiffs acknowledge in their pleading, they failed to make an interest payment that was due under the Notes at 11:00 a.m. Eastern Time on September 30, 2025. The Indenture governing the Notes gave holders the right to accelerate upon "the continuance of such default for a period of 30 days." When 11:00 a.m. on October 30, 2025, came and went without a cure, noteholders issued a notice of acceleration before the Debtors filed bankruptcy petitions later that evening. Upon acceleration, the entire face amount of the Notes became immediately due and payable, including whatever could have been characterized as OID. As a result, there was no unamortized OID as of the petition date, and so there is nothing to disallow under section 502(b)(2).

3.      Plaintiffs resist this conclusion, asserting the Indenture gave them a period of 30 days *plus 13 hours* to cure the payment default, such that they had until 11:59 p.m. on October 30 (after the petitions were filed) to cure. That is directly contrary to what the contract says: a period of 30 days does not mean a period of 30.54 days. As Black's Law Dictionary teaches, a "day" is any period of 24 hours; by contrast, a "calendar day" is the period that runs specifically from midnight to midnight. The Indenture generally expresses time limits in "calendar days," but the provision establishing the cure deadline for missed interest payments mandates measurement of the cure period in "days." By using "calendar days" in other provisions throughout the Indenture, the sophisticated parties who drafted it demonstrated that they knew how to craft a cure provision that would count time from midnight to midnight. In establishing the cure period at issue in this action, however, they chose the formulation that would count time from 11:00 a.m. on September 30 to 11:00 a.m. on October 30.

4.      Plaintiffs' argument depends on the counterintuitive notion that while the Notes specified a time for payment of 11:00 a.m., the Indenture created an altogether different time for curing nonpayment of 11:59 p.m. The Indenture cannot be divorced from the Notes in this way. The Indenture itself provides that Plaintiffs covenanted to pay interest punctually "in accordance with the terms of *the Notes and this Indenture*," demonstrating the parties' intent to read both documents together in determining payment deadlines. In any event, New York law is clear that indentures and the notes they govern are to be construed harmoniously as an integrated agreement, with all parts reconciled, and with specific clauses taking precedence over more general ones. Plaintiffs' position artificially separates the Indenture from the Notes, creates an unnecessary tension between payment and cure deadlines, and requires general terms (specifying the day on which payment is due) to take priority over specific terms (specifying what time of day payment is due). This is the opposite of how contracts should be construed under New York law.

5.      ***Debt-for-debt exchanges***. Every court to have addressed the issue, including the Fifth Circuit, has held that consensual debt-for-debt exchanges do not create OID for bankruptcy purposes as a matter of law. These decisions are based on the policy determination that courts should not disincentivize participation in out-of-court restructurings that help a troubled debtor avoid bankruptcy.

6.      This case law is dispositive. The complaint admits that the Notes were issued in a consensual debt-for-debt exchange, which Plaintiffs undertook because they were in financial distress and facing debt maturities they could not meet. The complaint further admits that each of the components of the exchange that Plaintiffs believe created OID—a backstop fee, a new equity issuance, and an upsized face amount—were offered to holders precisely because this was necessary to incentivize participation. Plaintiffs contend that OID was created because there was

a $135 million difference between what the Debtors "gave up" and what they "received" in the exchange, but this simplistic arithmetic fails to account for the imponderable value the Debtors got when they were relieved of a near-term maturity they could not meet and given a chance to continue as a going concern. If this Court were to side with Plaintiffs and disregard this value, it would set an awful precedent. Future distressed debtors will find it more difficult to restructure out of court because the forms of consideration offered to noteholders in this case will be viewed as creating disallowance risk under section 502(b)(2). That is the reason why all relevant precedent rejects Plaintiffs' theory.

7.     To the extent Plaintiffs argue that the 2027 Notes were issued with OID because this is how tax laws and regulations would treat the exchange transaction, they flagrantly ignore controlling case law. The Fifth Circuit, like all other courts to address the question, has held that tax treatment is irrelevant to whether OID is created for bankruptcy purposes. Nor does it matter that the exchanging noteholders agreed to a method of computing OID on their tax returns. Section 13(b) of the Exchange Agreement is unambiguously clear that the entirety of what the Plaintiffs call the "Exchange Tax Treatment Covenants," (Compl. ¶ 30), are for "U.S. federal, state and local income tax purposes." None of the parties to the Exchange Agreement agreed—and none of the Exchange Tax Treatment Covenants establish—that the 2027 Noteholders would be subject to partial disallowance for bankruptcy OID.

8.     ***Insolvency***. Binding Fifth Circuit case law holds that section 502(b)(2) cannot be invoked to deprive a creditor of full payment if a debtor is solvent. If any 2027 Note Obligor is solvent, therefore, Defendants will be entitled to payment in full, regardless of whether any portion of their claims constitutes unamortized OID. The complaint, however, contains no allegation that the 2027 Note Obligors are insolvent, let alone all of them. This is a failure of notice pleading.

Defendants are left guessing whether Plaintiffs believe any of the 2027 Note Obligors are insolvent and if so, which ones. Likewise, Defendants have no notice of the facts on which Plaintiffs intend to rely to prove the insolvency of the 2027 Note Obligors.

9. This pleading deficiency is not just an oversight; it is a tactical maneuver. Plaintiffs do not want to admit insolvency because their proposed DIP and RSA are premised on the assumption that the 2027 Unsecured Obligors are solvent. The whole point of this adversary proceeding is to deliver the value of those entities to their equity owner, and thus to the September 2029 Ad Hoc Group, which will come to own the parent-level Debtor through an equitizing plan without having to satisfy intervening creditor claims. If Plaintiffs admit that any of the 2027 Note Obligors are insolvent, then they will have admitted that there is no residual value in those entities for the parent to distribute to the Debtors' RSA counterparty. But if one or more of the 2027 Note Obligors are solvent, they must satisfy the entirety of Defendants' claims, including whatever constitutes "interest," before any of their value can be distributed up and out as contemplated by the RSA.

10. The Debtors cannot have it both ways. They cannot premise a proposed restructuring on the solvency of the 2027 Note Obligors while also seeking disallowance of claims on a theory that depends on those entities' insolvency. If Plaintiffs want to seek disallowance under section 502(b)(2), they must satisfy the requirement to plead insolvency based on a good-faith belief, under Rule 9011, that the allegation has factual support. If they do not want to certify to the Court that there is evidentiary support for an allegation of insolvency (because they would rather pursue a chapter 11 plan premised on solvency), then Plaintiffs should not be allowed to proceed with this action.

11.    ***Claim splitting***. Plaintiffs assert that their Special Committee has been investigating other possible grounds for disallowing Defendants' claims, such as under a fraudulent transfer theory. Arguing that this investigation should not be "rushed," Plaintiffs seek the extraordinary relief of an order permitting them to litigate this adversary proceeding based on section 502(b)(2) now, and then to take another bite at the apple later if they decide there is some other challenge they would like to try out.

12.    This is not how litigation in federal court works. The principles of *res judicata* and the related rule against claim splitting were designed to spare defendants from exactly this kind of serial litigation. If Plaintiffs believe they have other theories of disallowance, they should be required to bring them together, or else face the consequences of claim preclusion.

13.    The circumstances of this case do not justify deviating from *res judicata*. The exchange transaction that resulted in the 2027 Notes occurred in December 2024, more than a year ago, and Plaintiffs acknowledge the Special Committee has been conducting its investigation since it formed in June 2025, more than seven months ago. The Special Committee has had ample time to make up its mind about whether to pursue other theories of disallowance. And it is the Special Committee that committed the Debtors to the RSA and thus obligated them to pursue this adversary proceeding on an expedited basis. It is not Defendants' fault that the Special Committee has chosen to pursue this action with utmost haste before it has concluded its investigation. And so it is unfair to deny Defendants the protections of *res judicata* based on the Special Committee's own litigation choices.

14.    What is really going on here is the Debtors are reluctant to pursue fraudulent transfer theories right now because of all debt exchanges they undertook in 2024, the exchange that created the notes held by the September 2029 Ad Hoc Group is most vulnerable to this line of

attack. The RSA presumes the 2027 Unsecured Obligors are solvent (which should eliminate any fraudulent transfer theory involving those entities), but the September 2029 Ad Hoc Group's separate obligors are insolvent (which would make such a theory involving those entities much more plausible). Plaintiffs do not want to raise fraudulent transfer claims against Defendants now because there would be no justification for doing so without also challenging the exchange that created the notes held by the September 2029 Ad Hoc Group, the Debtors' current ally. Instead, Plaintiffs want to wait and see what happens in this litigation but be prepared to deploy fraudulent transfer claims if they are unsuccessful and their alliance with the September 2029 Ad Hoc Group breaks down. That is gamesmanship, not a valid reason to grant relief from preclusion principles.

## BACKGROUND

15.     The following facts are drawn from the complaint (Dkt. 1), materials incorporated or referenced therein, and sources of which the Court may take judicial notice. Capitalized terms not defined herein have the same meanings as in the complaint or the first-day declaration of John Castellano (Main Case Dkt. 26 ("Castellano Decl.")), which the complaint expressly incorporates (Compl. n.3).

### A.     OPI and its prepetition refinancing transactions.

16.     OPI is a publicly traded REIT that owns and leases office properties. Compl. ¶ 14. In 2024, the Company faced significant headwinds. Compl. ¶ 16; Castellano Decl. ¶ 8. There was a marked decline in the demand for office space spurred by increased remote work, especially in the Washington D.C. area where many of the Company's properties are found. Castellano Decl. ¶¶ 76–77. This led to a decrease in operating cash flows and increased re-leasing costs. *Id.* Macroeconomic factors, including rising interest rates, also increased the Company's borrowing costs and decreased some tenants' ability to renew their leases, leading to more vacancies. *Id.* at ¶¶ 78–79. Likewise, the Company's operational and capital structure deteriorated, which resulted

in significant ongoing debt service costs and limited options for refinancing because of a lack of available capital and poor liquidity. *Id.* at ¶¶ 80–82.

17.     To address its challenges, the Company worked to right-size its capital structure, manage its maturity profile, and improve its property portfolio. *Id.* at ¶ 83. It engaged in a series of transactions, including debt exchanges and issuances, to extend maturities, capture discount, and manage liquidity. *Id.* at ¶ 84. In January 2024, OPI entered into a new secured credit agreement to replace its existing $750 million unsecured revolving credit facility. *Id.* at ¶ 85. The following month, OPI issued $300 million of notes due March 2029 to pay down existing indebtedness, including old senior secured notes coming due in 2024. *Id.* at ¶ 86. In June 2024, OPI issued new notes due September 2029 in exchange for old notes with earlier maturities; and in October 2024, the Company consummated a follow-on transaction through which it exchanged additional 2025 notes for more September 2029 notes. *Id.* at ¶¶ 87–88.

**B.     The December 2024 Exchange and the 2027 Notes.**

18.     Central to this action are notes due in March 2027, which were issued as part of another of the Company's out-of-court workouts in 2024. As the maturity date for the Company's 2025 notes approached, it became apparent that the Company would not be able to comply with its repayment obligations. Compl. ¶ 16. OPI had insufficient cash to meet the maturity, lacked access to alternative refinancing options, and faced restrictions on the incurrence of new indebtedness by covenants under its other debt instruments. *Id.* OPI thus engaged with holders of the 2025 notes and negotiated a debt-for-debt exchange transaction. *Id.* at ¶ 17.

19.     The December 2024 Exchange "was designed to address OPI's near-term debt maturities, provide additional runway for the Company to manage its capital structure, and avoid a default or distressed refinancing." *Id.* at ¶ 19. Since the Company "lacked alternatives to extend its looming debt maturity dates," OPI offered "increased principal, common stock, and cash

premiums to incentivize participation in the December 2024 Exchange." *Id.* at ¶ 20. The terms of the transaction, which were governed by an Exchange Agreement,[3] provided that exchanging noteholders could surrender up to $340 million of 2025 notes. *Id.* at ¶ 22. If the principal amount of 2025 notes exchanged was less than $340 million, a group of exchanging holders agreed to backstop the exchange in cash so that OPI would be able to retire a full $340 million. *Id.*

20.     In the exchange, $282 million in principal amount of 2025 notes was tendered; the backstop parties thus provided about $58 million in cash to OPI, which the Company used to retire the remaining 2025 notes. *Id.* at ¶ 23. The credit support for the 2027 Notes includes first-priority liens on 35 properties held by the 2027 First-Lien Obligors, second-priority liens on 19 properties of subsidiary guarantors that also granted first-priority liens to support the September 2029 Notes, and unsecured guarantees from the 2027 Unsecured Obligors. *Id.* at ¶ 26; Castellano Decl. ¶ 90.

21.     In sum, the transaction "allow[ed] OPI to retire the Old 2025 Notes and avoid a potential maturity default." Castellano Decl. at ¶ 90. It offered the Company "a path" to avoid an impending payment default, by "address[ing] its outstanding Old 2025 Notes, which were coming due February 1, 2025." *Id.* at ¶ 89.

22.     The 2027 Notes bear an interest rate of 3.25% per annum, payable quarterly. Compl. ¶ 25; Indenture § 2.01(a) (Interest Rate; Interest Payments). They additionally require quarterly principal amortization of $6.5 million, with a mandatory principal repayment of $125 million due March 1, 2026, unless satisfied earlier with proceeds of specified asset sales. Compl. ¶ 25. In addition to the 2027 Notes, the participating noteholders in the December 2024 Exchange received OPI common stock valued at approximately $15.76 million in aggregate, a $10

---

[3]     The complaint references both the Exchange Agreement that governed the December 2024 Exchange and the Indenture that governs the 2027 Notes, but attaches only the Indenture and erroneously refers to it as the Exchange Agreement. Compl. ¶ 18; Dkt. 1-1 at 12. For clarity, this motion attaches the Exchange Agreement as Exhibit A and the Indenture as Exhibit B, and it refers to each document separately.

million "support premium," and $4.6 million of accrued interest on the 2025 notes. *Id.* at ¶ 27. The noteholders that provided the cash backstop received a $15 million "backstop premium." *Id.* at ¶ 28.

23.     Section 13(b) of the Exchange Agreement, entitled "Tax Treatment," provides that "[f]or all U.S. federal, state and local income tax purposes," the parties to the agreement would treat the backstop premium, support premium, and other components of the transaction in specified ways, called the "Intended Tax Treatment." Exchange Agreement at 37; Compl. ¶ 30. This covenant pertains to how the exchange participants and the Company would treat components of the December 2024 Exchange on their tax returns. As the Complaint acknowledges, section 13(b) makes clear that it is for "tax purposes" only. Compl. ¶¶ 29 ("[f]or accounting and tax purposes"), 30 ("under applicable tax law"), 31 ("for federal income tax purposes"), 32 ("for U.S. federal income tax purposes"), 35 ("for tax purposes"). Nowhere in the Exchange Agreement or any other contract did Defendants agree that original issue discount would exist or be treated in any particular way under the Bankruptcy Code.

### C.     The prepetition acceleration notice

24.     Under the Indenture, "[t]he Company covenant[ed] and agree[d] that it will duly and punctually pay" principal and interest on the Notes "in accordance with the terms of the Notes and [the] indenture." Indenture § 10.01. According to both the Indenture and the Notes, interest is "payable quarterly in arrears" on specified days, including September 30 of each year. Indenture § 2.01, A-15 (Reverse of Note) § 2. The Notes provide that on any day on which amounts become due and payable, the Company is obligated to make payment by depositing the requisite funds with the paying agent "[b]y no later than 11:00 a.m. Eastern Time." Indenture A-15 (Reverse of Note) § 3.

25.     The Indenture provides that a default in the payment of interest "when it becomes due and payable, and continuance of such for default for a period of 30 days," constitutes an Event of Default. Indenture § 5.01(b). Upon an Event of Default, beneficial owners of a majority in principal amount of the Notes have the right to "declare the principal amount of the Notes plus accrued and unpaid interest, if any, to be due and payable immediately" by sending a written notice to the Company. Indenture § 5.02.

26.     The Company did not make its interest payment due on September 30, 2025, let alone by 11:00 a.m. that day. Nor did it make payment by 11:00 a.m. on October 30, which was thirty days later. So, at 1:13 p.m. on October 30, requisite holders of the Notes delivered to OPI a letter stating that a payment default remained uncured, resulting in an Event of Default as of 11:00 a.m. that day, and that the noteholders were accelerating all amounts due under the Notes. Compl. ¶ 2; Acceleration Notice.[4] At the time the holders delivered the notice, the Debtors had not yet filed petitions for bankruptcy.

27.     OPI purported to reject the acceleration notice later that day. Compl. ¶ 43. It sent a letter claiming that the acceleration notice was ineffective because the cure period for the missed interest payment did not terminate "until 11:59 p.m. on October 30." Dkt. 1-3. The Debtors commenced their bankruptcy cases later that night, beginning around 8:30 p.m. Eastern Time.

**D.     This adversary proceeding.**

28.     The Debtors commenced these chapter 11 cases with a proposed DIP and RSA. The proposed DIP lender, and sole creditor constituency that agreed to the RSA, is an ad hoc group of holders of the Company's September 2029 Notes. Castellano Decl. ¶¶ 11, 98, 100, 107. Under the

---

[4]     Plaintiffs attached the noteholders' letter to the complaint. A copy of the cover email transmitting the letter, including a date and time stamp, was previously filed on the chapter 11 docket. Main Case Dkt. 43-7. For convenience, it is included with this motion as Exhibit C.

RSA, the Company was required within four business days of the petition date to commence an adversary proceeding seeking disallowance of unamortized OID associated with the 2027 Notes under section 502(b)(2) of the Bankruptcy Code. Dkt. 26 ("RSA, Restructuring Term Sheet" at 13–14, "Case Milestones") at 115–16. The RSA further specifies that the adversary proceeding must "reserve the Debtors' rights to seek additional disallowance of the obligations incurred, and the invalidation of the security interests granted, in connection with the 2027 Senior Secured Notes." *Id.*

29.     The goal of this action is to reduce the size of Defendants' claims so that it is equal to or less than the value of the collateral pledged by the 2027 First-Lien Obligors. That is, Plaintiffs want a determination that Defendants have no deficiency claim once they have received their collateral, and therefore no right to the value of any of the 2027 Unsecured Obligors. The hope is to free up the value of the 2027 Unsecured Obligors by stripping Defendants' claims, such that this value will be available to the parent-level Debtor and can be distributed to the Debtors' proposed DIP lender (the September 2029 Ad Hoc Group) in an equitizing plan. Castellano Decl. ¶¶ 11(c)–(d), 104(c)–(e). In short, Plaintiffs' entire restructuring is premised on the belief that the 2027 Unsecured Obligors are solvent.

30.     Plaintiffs filed the complaint on November 2, 2025. They allege that the 2027 Notes were issued at a significant discount to face value, and that "[f]or accounting tax purposes, this discount is recognized as OID, which represents the difference between the stated principal amount of the new notes and the value of the consideration received by the issuer in the exchange." Compl. ¶ 29. The complaint alleges that the amount of OID associated with the 2027 Notes at issuance was $135.1 million. *Id.* at ¶ 38. Plaintiffs assert this amount consists of three components: $105 million representing the increase in principal amount of the 2027 Notes compared to the 2025

notes they replaced (*i.e.*, the difference between $445 million and $340 million); $15.76 million representing the value of the OPI equity issued to the exchanging noteholders; and $15 million representing the backstop premium paid to the backstop parties. *Id.* at ¶¶ 20, 27–28, 38.

31.     The complaint asserts one cause of action for declaratory judgment, although multiple rulings are requested. Compl. ¶¶ 49–56. *First*, Plaintiffs ask the Court to declare that calculating OID in the 2027 Notes as of the issue date shall be determined according to the tax provisions in section 13(b) of the Exchange Agreement and applicable tax regulations. *Id.* at ¶¶ 29–38, 51(a). *Second*, Plaintiffs ask for a declaration that any unamortized portion of the total OID as of the petition date shall be calculated using the "Constant Yield Method," and that any resulting unamortized OID amount shall be disallowed under section 502(b)(2) of the Bankruptcy Code. *Id.* at ¶¶ 39–41, 51(b). *Third*, Plaintiffs seek a declaration that they will not be deemed to have waived any additional bases to disallow Defendants' claims, such as under fraudulent transfer law, notwithstanding that they did not assert these theories in this action. *Id.* at ¶¶ 46–48, 51(c).

## **ARGUMENT**

32.     Federal Rule of Civil Procedure 12(b)(6), made applicable to this action by Federal Rule of Bankruptcy Procedure 7012, requires dismissal of an action when the complaint fails to state a claim for relief. Fed. R. Civ. P. 12(b)(6). The plaintiff has the burden of stating a claim "that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[C]onclusory allegations will not suffice to prevent a motion to dismiss, and neither will unwarranted deductions of fact." *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) (cleaned up).

33.     "In deciding a motion to dismiss the court may consider documents attached to or incorporated in the complaint and matters of which judicial notice may be taken." *Id.*; *see also, e.g.*, *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019) ("When a defendant

attaches documents to its [Rule 12(b)(6)] motion that are referred to in the complaint and are central to the plaintiff's claims, the court may also properly consider those documents.") (citations omitted). "A court may take judicial notice of related proceedings and records in cases before the same court." *MacMillan Bloedel Ltd. v. Flintkote Co.*, 760 F.2d 580, 587 (5th Cir. 1985). Further, "it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).

## I.   The 2027 Notes were validly accelerated before the petition date.

34.     Plaintiffs seek declarations concerning how to calculate the amount of unamortized OID in the 2027 Notes as of the petition date, and further request disallowance of this amount as unmatured interest under section 502(b)(2). Compl. ¶ 51. But the Court need not reach any of these issues. As the complaint acknowledges, holders of the 2027 Notes issued an acceleration notice declaring the full face amount to be immediately due and payable before the bankruptcy cases were commenced. Compl. ¶¶ 42–44. If that acceleration notice was valid, then whatever OID existed had become due by the petition date, and there is nothing to disallow as "unmatured" or "unamortized" under section 502(b)(2), let alone any need to determine calculation methodology.

### A.   The contractual language specifies that the cure period would last for 30 days, not 30.54 days.

35.     The acceleration notice was timely and efficacious. On September 30, 2025, an interest payment came due, and Plaintiffs were required to deposit the funds with the payment agent by 11:00 a.m. Eastern Time that day. Compl. ¶¶ 42, 44; Indenture § 2.01(a) (specifying September 30 as a payment date); Indenture at A-15 (Reverse of Note) § 3 (requiring deposit of the funds by 11:00 a.m.). But the Company did not comply. This resulted in a default in the payment of interest starting at 11:01 a.m. on September 30, the minute after the deadline was missed.

36.     Under the Indenture, an Event Default would occur upon the "continuance" of the payment default "for a period of 30 days." Indenture § 5.01(b). By 11:01 a.m. on October 30, the default had been in continuance for "a period of 30 days," yet the Company still had not made the interest payment. At 1:13 p.m. that day—30 days, 2 hours, and 13 minutes after the Company was required to make its interest payment—the holders sent the default notice. Compl. ¶ 42; Acceleration Notice. It was not until about seven hours later, at approximately 8:30 p.m., that the Debtors began filing their chapter 11 petitions.

37.     Plaintiffs make a conclusory allegation that their cure period lasted until midnight on October 30, 2025, and therefore "the October 30 acceleration notice was ineffective." Compl. ¶ 44; Dkt. 1-3. In substance, they contend that the payment default had to remain in continuance for a period of 30 days plus 13 hours—or 30.54 days—for an Event of Default to occur. That is manifestly contrary to what the Indenture and Notes say.

38.     The Indenture is clear that the cure period would last for 30 days and no longer. A "day" means "[a]ny 24-hour period; the time it takes the earth to revolve once on its axis." DAY, Black's Law Dictionary (12th ed. 2024). By contrast, a "calendar day" refers to the specific 24-hour period from midnight to midnight. *Id.*[5] The Indenture and the Notes use both terms for different purposes in different provisions. There are several clauses of the Indenture that speak specifically in terms of calendar days. *See* Indenture § 1.16 (notices deemed to have been given "five (5) calendar days" after mailing if sent by registered or certified mail); *id.* § 2.01(a) (notes to be paid to persons who were registered as holders on the date that is "14 calendar days" before

---

[5]     "Black's Law Dictionary is routinely used to determine the 'plain meaning' of statutory or contractual language" *Pfizer Inc. v. U.S. Dep't of Health & Hum. Servs.*, 2021 WL 4523676, at *11 n.6 (S.D.N.Y. Sept. 30, 2021) (citing cases), *aff'd sub nom.*, 42 F.4th 67 (2d Cir. 2022). This is consistent with the longstanding rule in New York that when contracts are drafted with the assistance of lawyers and use terms with legal meanings, including terms specifying time limits, "the parties thereto will be presumed to have intended such words, or terms, to have their proper legal meaning and significance." *Malbone Garage v. Minkin*, 272 A.D. 109, 113 (2d Dep't), *aff'd*, 297 N.Y. 677 (1947).

maturity); *id.* § 10.11(d) (money received following a loss of collateral may be reinvested "within 120 calendar days").

39.     The cure period for missed interest payments, by contrast, is expressed in terms of "days," not "calendar days." *Id.* § 5.01(b). The same is true of other definitions of an Event of Default that include cure periods or otherwise are tied to the passage of time. *Id.* § 5.01(c) (final judgment of $25 million shall not be stayed for "a period of 60 consecutive days"); 5.01(d) (breach of restrictive covenant shall be in continuance for a period of 45 days); 5.01(f) (order of liquidation remains "unstayed and in effect for 90 days"); 5.01(i) (liens on collateral exceeding $25 million shall cease to be valid or enforceable, and "such default continues for 30 days"); 5.01(j) (failure to comply with security documents for "60 days").

40.     That is dispositive. It demonstrates that the drafters knew how to distinguish between periods that last exactly 24 hours and periods that run from midnight to midnight following an event. Under New York law,[6] a court interpreting a contract that uses different terms in different provisions must give effect to "[t]he difference in the language of the two provisions, by which the parties must be deemed to have intended different meanings." *Frank B. Hall & Co. of N.Y. v. Orient Overseas Assocs.*, 48 N.Y.2d 958, 959 (1979). This is because drafters of sophisticated contracts "must be presumed to know how to use parallel construction and identical wording to impart identical meaning when they intend to do so, and how to use different words and construction to establish distinctions in meaning." *Int'l Fid. Ins. Co. v. Cnty. of Rockland*, 98 F. Supp. 2d 400, 412 (S.D.N.Y. 2000); *see also Thompson v. Mun. Credit Union*, 2022 WL 2717303, at *4 (S.D.N.Y. July 13, 2022) ("The use of different terms in the same agreement

---

[6]     The Indenture and the Notes are governed by, and construed in accordance with, New York law. Indenture at 28 § 1.12 (Governing Law); Indenture at A-20 (Reverse of Note) § 22 (Governing Law).

strongly implies that the terms are to be accorded different meanings." (quoting *NFL Enters. LLC v. Comcast Cable Commc'ns, LLC*, 851 N.Y.S.2d 551, 557 (1st Dep't 2008)).

41.     A straightforward application of the plain language of the Indenture and Notes thus shows that the cure period for missed interest payments was intended to last only for 30 periods of 24 hours (a total of 720 hours) commencing the moment the payment default accrued, and not for 30 days plus the number of hours remaining until midnight (a total of 733 hours). *See In re Craddock-Terry Shoe Corp.*, 91 B.R. 392, 396 (Bankr. W.D. Va. 1988) ("Ninety days means ninety days; it should not be stretched to mean ninety days plus part of another day."). The parties had a method of drafting the contract to give the Debtors until midnight on October 30. They could have said an Event of Default would occur if the payment default remained in continuance for "a period of thirty calendar days." But they deliberately chose not to deploy this formulation. Plaintiffs cannot rewrite the contract in litigation to give themselves a longer cure period than they were able to obtain at the bargaining table.

### B.     Plaintiffs improperly try to divorce the Indenture from the Notes.

42.     Plaintiffs contend "that the deadline for *making* interest payments [was] different than the deadline for *curing* missed payments." Dkt. 1-3 (response to acceleration) (emphasis in original). According to this position, because only the Notes themselves refer to a specific time for payment, that deadline should be disregarded for purposes of interpreting the Indenture, where the cure period is laid out. This is unavailing for multiple reasons.

43.     *First*, in the Indenture itself, "[t]he Company covenant[ed] and agree[d] that it [would] duly and punctually pay" principal and interest "*in accordance with the terms of the Notes and this Indenture.*" Indenture § 10.01 (emphasis added). Since the Indenture expressly obligates Plaintiffs to meet all payment deadlines *in the Notes*, Plaintiffs cannot simply ignore the Notes and look only to the Indenture to extricate themselves from time limitations in the Notes.

44.     *Second*, divorcing the Indenture from the Notes in the way Plaintiffs urge would contravene established methods of contract interpretation. Under New York law, an indenture and the notes it governs must be "construed together" because they form an integrated agreement. *E.g.*, *Block v. Mansfeld Mining & Smelting Co.*, 23 F. Supp. 700, 704 (E.D.N.Y. 1938). The documents make clear that this was the parties' intent here: they specify that all "Note Documents," including the Indenture and the Notes, constitute the "entire agreement and understanding" of the parties. Indenture at D-17 (Form of Mortgage). Courts faced with this language "reject the notion that the Note is somehow less important than the Note Agreement [the indenture]. . . . [T]he Note makes up part of the contract itself, and its terms must be considered in conjunction with the terms of the Note Agreement." *Cimontubo-Tubagens E Soldadura LDA v. Petroleos De Venez., S.A.*, 2021 WL 2460291, at *5 (S.D.N.Y. June 17, 2021), *report and recommendation adopted as modified*, 2021 WL 5567496 (S.D.N.Y. Nov. 29, 2021).

45.     *Third*, under New York law, "all provisions of a contract should be read together as a harmonious whole, if possible," and conflicts should not be read into an agreement. *Weeks Marine, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*, 511 F. App'x 78, 80 (2d Cir. 2013) (cleaned up) (finding that a three-year notice requirement did not conflict with a "prompt notice" requirement: the former "provide[d] a general, outer-limit time bar," whereas the latter was "an additional" specific requirement). Further, specific terms in a contract override more general ones. *See, e.g.*, *In re AMR Corp.*, 485 B.R. 279, 302 (Bankr. S.D.N.Y. 2013), *aff'd*, 730 F.3d 88 (2d Cir. 2013) (applying principle and collecting authority); *Thompson v. Mun. Credit Union*, 2022 WL 2717303, at *6 (S.D.N.Y. July 13, 2022) (same).

46.     Accepting Plaintiffs' interpretation also would yield an absurd and commercially unreasonable result. If Plaintiffs are correct, they were permitted to cure by making a deposit or

executing a wire as late as 11:59 p.m. on October 30, a time when banks obviously were closed and unable to accept the deposit or complete the wire. Had Plaintiffs waited this long, they could not possibly have succeeded in making payment until the following day, on October 31, which even they admit would have been too late. This demonstrates precisely why the Notes contain an 11:00 a.m. deposit time in the first place: to ensure the payment agent would receive payment on the correct date, without the complications of wire deadlines and bank closing times. And it means Plaintiffs' argument is self-defeating. Under New York law, a contract must be construed to achieve a practical interpretation in light of its underlying business purpose and avoid absurd results. *E.g.*, *Mastrovincenzo v. City of New York*, 435 F.3d 78, 104 (2d Cir. 2006); *In re Texaco, Inc.*, 668 B.R. 1, 29 (Bankr. S.D.N.Y. 2025). It would make no sense to interpret the Indenture and Notes to permit a cure payment at a time of day when it is impossible as a practical matter for the cure to occur.

47.     Plaintiffs ignore these canons. Their interpretation creates an unnecessary tension in the documentation between payment deadlines and cure deadlines. It relies on the general provision in the Indenture specifying on what *day* payment must be made while disregarding the more specific provision in the Note specifying what *time of day* payment is due. And it expands the cure deadline beyond the time at which a cure would even be possible. That is the opposite of how terms in a contract should be reconciled. The more natural reading, and the one that harmonizes all provisions of the integrated agreement, is that payment was due at 11:00 a.m. on September 30, and the cure period ended exactly 30 days later at 11:00 a.m. on October 30.

## II.     The complaint fails to state a claim for disallowance under section 502(b)(2).

48.     The analysis can and should stop there. For the reasons above, the full face amount of the 2027 Notes became immediately due and payable before the chapter 11 petitions were filed. To whatever extent there was OID, no amount was unamortized by the petition date, so there is

nothing to disallow under section 502(b)(2). Regardless of whether the acceleration notice was timely, however, the complaint still should be dismissed.

### A. The December 2024 Exchange did not create OID as a matter of bankruptcy law.

49.    The December 2024 Exchange was a consensual debt-for-debt exchange, designed as an out-of-court solution to OPI's financial distress and impending maturities. Multiple courts, including the Fifth Circuit, have held that such exchanges—as a matter of law—do not create OID subject to disallowance under section 502(b)(2) of the Bankruptcy Code. Those cases govern here and mandate dismissal.

### 1. Debt-for-debt exchanges do not create OID for bankruptcy purposes.

50.    The first court to address the issue was the Second Circuit in *LTV Corp. v. Valley Fidelity Bank & Trust Co. (In re Chateaugay Corp.)*, 961 F.2d 378 (1992). In that case, LTV engaged in a consensual out-of-court restructuring through which it exchanged $1,000 of new notes and 15 shares of its common stock for each $1,000 of its old notes. *Id.* at 380. In its subsequent bankruptcy case, LTV objected to the proof of claim of the indenture trustee for the new notes, seeking an order disallowing unamortized OID under section 502(b)(2). *Id.* The Second Circuit concluded that unamortized OID is "unmatured interest," but that the exchange transaction did not create any new OID for purposes of the Bankruptcy Code. *Id.* at 381–82.

51.    The court based its holding on "the strong bankruptcy policy in favor of the speedy, inexpensive, negotiated resolution of disputes, that is an out-of-court or common law composition." *Id.* If exchanging debt increases the amount of OID that is disallowable in bankruptcy, the court held, "then creditors will be disinclined to cooperate in a consensual workout that might otherwise have rescued a borrower from the precipice of bankruptcy." *Id.* That is, the law should not punish a creditor for cooperating "with a struggling debtor" in a consensual

exchange; otherwise, it would create "a disincentive for creditors to cooperate with a troubled debtor" and reward holdouts. *Id.* Thus, no new OID was deemed to be created in LTV's exchange as a matter of law. *Id.*

52.     The same issue was presented to the Fifth Circuit in *Texas Commerce Bank, N.A. v. Licht (In re Pengo Industries, Inc.)*, 962 F.2d 543 (5th Cir. 1992). There, much like in *Chateaugay*, Pengo was in distress and so pursued an out-of-court restructuring. *Id.* at 545. It exchanged $1,000 of new notes for each $1,000 of old notes; the new notes had a lower interest rate, were senior in payment, and could be redeemed for common stock at a more favorable rate compared to the old notes. *Id.* In Pengo's bankruptcy, the creditors' committee and a holder of the old notes objected to proofs of claim by the trustee for the new notes, seeking disallowance of unamortized OID under section 502(b)(2). *Id.* The Fifth Circuit "endorse[d] the reasoning of the Second Circuit" and concluded that no OID was created in Pengo's exchange as a matter of law because "[w]e strongly disfavor a judicial interpretation of the Bankruptcy Code that contravenes the substantial Congressional policy favoring out-of-court consensual workouts." *Id.* at 549.

53.     In each of *Chateaugay* and *Pengo*, the courts addressed face-value exchanges— those where the face amount of the old notes and the new notes was the same. In *Official Committee of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC)*, 501 B.R. 549 (Bankr. S.D.N.Y. 2013) ("*ResCap*"), the bankruptcy court for the Southern District of New York extended the same reasoning to fair-value exchanges—those where the face amount of the new notes is lower than the face amount of the old notes. ResCap offered to exchange outstanding unsecured notes for a combination of lower-face-value secured notes and cash. *Id.* at 576. Addressing a section 502(b)(2) objection in ResCap's bankruptcy, the court followed *Chateaugay* and *Pengo*, concluding that there is "no meaningful basis upon which to distinguish" face-value

and fair-value exchanges. *Id.* at 588. The court relied on the fact that "both fair and face value exchanges offer companies the opportunity to restructure out-of-court, avoiding the time and costs—both direct and indirect—of a bankruptcy proceeding." *Id.*

### 2. *Pengo* and similar cases control this action.

54.     There is no reason to deviate from *Chateaugay*, *Pengo*, and *ResCap* in this action. At the time of the December 2024 Exchange, OPI was in financial trouble and facing an upcoming maturity it could not repay or refinance. Compl. ¶ 16. And so, "lack[ing] alternatives to extend its looming debt maturity dates," OPI offered "increased principal, common stock, and [cash] premiums to incentivize participation in the December 2024 Exchange." *Id.* at ¶ 20. The resulting exchange was, as Plaintiffs admit, "the most effective means of addressing [the Company's] capital structure challenges while minimizing disruption to its business and stakeholders." *Id.* at ¶ 17.

55.     Because of the exchange, OPI was able to obtain "additional runway for the Company to manage its capital structure, and avoid a default or distressed refinancing." *Id.* at ¶ 19. Old notes with an impending 2025 maturity were replaced by new notes not maturing until 2027. *Id.* at ¶ 20. And the 3.25% interest rate on the new notes was substantially lower than prevailing market rates. For example, the interest rate on the Company's 2029 Notes, some of which had been issued less than three months earlier, was almost three times greater at 9%. Exchange Agreement at 64. The interest rate on the 2027 Notes was lower even than the daily Federal Treasury rate, which was 4.15% on the date of issuance.[7] In the aggregate, the creditor concessions in the

---

[7]     The Court may take judicial notice of the federal treasury rate. *See, e.g.*, *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1143–44 (C.D. Cal. 2018), *aff'd sub nom.*, 794 F. App'x 669 (9th Cir. 2020) (on a motion to dismiss, taking judicial notice of "a chart of U.S. Dollar exchange rates taken from the Federal Reserve website"); *PayServices Bank v. Fed. Rsrv. Bank of S.F.*, 2024 WL 1347094, at *1 n.1 (D. Idaho Mar. 30, 2024) (on a motion to dismiss, taking judicial notice of information about the Federal Reserve taken from the Federal Reserve's website); *cf. Golden Triangle Vein Ctr. v. Total Body Contouring Inc.*, 2018 WL 1527841, at *3 (N.D. Miss. Mar. 28, 2018) (taking judicial notice of Treasury rates on a renewed motion for default judgment).

December 2024 Exchange gave the Company the ability to continue operating. Castellano Decl. ¶ 8.

56.     This case therefore raises the same policy concerns that motivated the courts, including the Fifth Circuit, in concluding that debt-for-debt exchanges do not create OID for bankruptcy purposes. OPI was a distressed debtor aiming to stay out of bankruptcy. It engaged with its creditors to find an out-of-court solution—and it found one. Disallowing a portion of Defendants' claims under section 502(b)(2) would punish them for having entered into an out-of-court workout and would have a terrible market effect that is at odds with well-recognized bankruptcy policy.

> a.  **The Court should not disincentivize creditors from partially equitizing their debt in exchange transactions.**

57.     This is especially true considering the components of the exchange that Plaintiffs assert gave rise to OID for bankruptcy purposes. Plaintiffs first allege that the OID created in the exchange must include the $15.76 million in OPI equity that was issued to the participating noteholders. Compl. ¶¶ 27–28. A ruling for Plaintiffs on this point would mean that distressed debtors would be inhibited from reducing their indebtedness by equitizing a portion of it. Creditors being offered an exchange that included a partial equity component would be less willing to participate, fearing that accepting the equity would create disallowance risk for their new notes. The Second Circuit in *Chateaugay* recognized this and confirmed that the issuance of stock should not contribute to OID: the exchange in that case involved the issuance of new equity in addition to new notes, and the court still concluded that no new OID was created for bankruptcy purposes. 961 F.2d at 380, 382.

58.     Nor does it make any economic sense to consider equity as creating "interest" in the form of OID. Interest is compensation for the risk associated with an extension of credit and

the time value of money. *See Pengo*, 962 F.2d at 546 ("OID constitutes a 'method of providing for

and collecting what in economic fact is interest to be paid to compensate for the delay and risk

involved in the ultimate repayment of monies loaned.'" (quoting *In re Public Serv. Co.*, 114 B.R.

800, 803 (Bankr. D.N.H. 1990))); *see also* INTEREST, Black's Law Dictionary (12th ed. 2024)

("The compensation fixed by agreement or allowed by law for the use or detention of money, or

for the loss of money by one who is entitled to its use."). As the *Chateaugay* bankruptcy court put

it:

> Interest is the payment made for the use of money. The payment of interest by the borrower
> compensates the lender for the length of time the money is being used by the borrower, the
> risk of loss of purchasing power over time associated with inflation, and various risks related
> to the fact that the money may not be paid back in a timely fashion, or at all, because of the
> financial condition of the debtor at the time set for repayment.

*In re Chateaugay*, 109 B.R. 51, 56 (Bankr. S.D.N.Y. 1990). The new OPI equity issued in the

December 2024 Exchange was not compensation for the time value of money. As Plaintiffs admit

in the complaint, OPI offered "common stock[] and premiums to incentivize participation in the

December 2024 Exchange." Compl. ¶ 20.

59.     This conclusion is reinforced by the fact that a company's stock is not the

company's property, and the issuance of new stock does not deplete the company's value in any

way. *Uranga v. Geib (In re Paso Del Norte Oil Co.)*, 755 F.2d 421, 424 (5th Cir. 1985) ("It is

widely recognized, and we have previously held, that a corporation, even if a debtor in bankruptcy,

has no property interest in the shares of its stock owned by shareholders."); *Decker v. Advantage

Fund, Ltd.*, 362 F.3d 593, 596 (9th Cir. 2004) ("Appellees are correct that unissued stock is not an

interest of the debtor corporation in property; it is merely equity in the corporation itself."). It

would be illogical to relieve a debtor of obligations under section 502(b)(2) on account of equity

that cost the debtor nothing to issue. Put another way, Plaintiffs assert that OID should be

determined based on a comparison of what the Debtors got and what they "gave up" in the

exchange (Compl. ¶ 24), yet they "gave up" no value by issuing equity.

> b.     **The Court should not disincentivize creditors from backstopping exchange transactions.**

60.     The backstop fee similarly should not be deemed to have created OID. The backstop fee in the December 2024 Exchange served a very valuable purpose from OPI's perspective: it guaranteed the Company would achieve a full exchange of $340 million of old 2025 notes, thereby maximizing the debt relief that the transaction was designed to provide. When holders of only $282 million tendered their old notes, the backstop parties provided the Company with cash to take out the balance, and they received compensation for this beneficial service.

61.     This is not the kind of creditor behavior the Court should disincentivize. But the rule Plaintiffs want to adopt would have that effect. If they prevail, then in future exchange transactions, creditors will not be willing to backstop exchanges because they will not be able to receive compensation for doing so without facing disallowance risk in a bankruptcy case.

62.     Additionally, as with the equity issuance, it is illogical to conclude that the backstop fee was a form of "interest." The fee was not compensation for the use of money. It was compensation payable to the Backstop Commitment Parties for "agreeing to serve as backstop purchasers of the 2027 Notes," which helped the Company ensure "that the full $340 million in consideration from the Exchange Noteholders was received by OPI." Compl. ¶¶ 22, 28. As the Fifth Circuit has held, "a fee will not be considered interest if it is not for the use, forbearance or detention of money." *Achee Holds., LLC v. Silver Hill Fin., LLC*, 342 F. App'x 943, 944–45 (5th Cir. 2009) (prepayment fee was not interest under Texas's usury laws).

63.     That the backstop fee was not for this purpose is reinforced by the fact that it was not payable ratably to every holder of 2027 Notes; it was payable only to the subset of holders that consented to backstop the exchange. It would be implausible to conclude that a note issuance

included the functional equivalent of "interest" because the company paid a fee to some holders, and not others, as consideration for backstop services that only those holders performed.

### c. The Court should not disincentivize creditors from accepting an upsized principal amount in exchange transactions.

64.     The final component of the exchange that Plaintiffs contend contributed to OID was the $105 million upsizing of principal amount.[8] The complaint concedes, however, that this component of the exchange, like the others, was offered "to incentivize participation in the December 2024 Exchange because [OPI] lacked alternatives to extend its looming debt maturity dates." Compl. ¶ 20.

65.     That is reason enough to conclude that the upsizing of principal did not create OID. The upshot of *Chateaugay*, *Pengo*, and *ResCap* is that courts should not dissuade creditors from participating in consensual out-of-court exchanges. Determining that a particular form of consideration granted in an exchange generates OID would contravene this policy and deprive ailing debtors of restructuring options. That is, if the Court sides with Plaintiffs on this issue, a critical tool in the restructuring toolbox will be removed: distressed debtors will not be able to offer upsized principal to their creditors and get the same debt relief, since creditors will view this offer as laden with disallowance risk.

66.     Moreover, Plaintiffs' argument that upsized principal gives rise to a "discount" paints an incomplete picture. Their position is that a "discount" existed because of the difference between the $340 million of old 2025 notes that OPI retired and the $445 million of new 2027 Notes it issued, plus $30 million of fees and equity. Compl. ¶¶ 23–24. But this oversimplistic

---

[8]    The complaint additionally references a $10 million support fee and a payment of $4.6 million of accrued interest on the notes that were retired. Compl. ¶ 27. Plaintiffs do not appear to contend that these amounts contributed to OID in the 2027 Notes. *See* Compl. ¶¶ 33–38 (alleging calculation of issue price based on upsized principal with adjustments for new equity and backstop premium). Nor would this contention have merit. All the same arguments advanced herein would apply to these components of the exchange as well.

comparison fails to account for the extraordinary value the Debtors received in the December 2024 Exchange: additional runway that allowed them to avoid an impending maturity, stave off bankruptcy, and continue operating as a going concern.

67.     When this enormous (possibly invaluable) benefit is factored in, the arithmetic changes dramatically and the discount disappears. Plaintiffs do not allege that the option to continue their business, rather than file for bankruptcy, in December 2024 was worth less than $105 million or even less than $135 million. Nor would that have been a plausible allegation to make. That is the corollary of *Pengo* and related cases: the context of an exchange, and the rehabilitative benefit it offers the debtor, cannot be ignored.

### 3.     Tax treatment is irrelevant for purposes of section 502(b)(2).

68.     Plaintiffs ask for a judgment declaring that "the total OID generated upon issuance of the 2027 Notes shall be determined . . . using the Exchange Tax Treatment Covenants in conjunction with applicable Treasury Regulation." Compl. ¶ 51(a). That is, they blithely assume that if the December 2024 Exchange created OID for purposes of the exchanging holders' tax returns, it must have created the same amount of OID for bankruptcy purposes. This argument is directly contradicted by the case law, including *Pengo*, and therefore borders on frivolous.

69.     In *Chateaugay*, the Second Circuit observed that under the tax laws, LTV's new notes would be deemed to have OID, but rejected this as a basis to conclude that OID was created for bankruptcy purposes: "The tax treatment of debt-for-debt exchanges derives from the tax laws' focus on realization events, and suggests that an exchange offer may represent a sensible time to tax the parties. The same reasoning simply does not apply in the bankruptcy context." 961 F.2d at 383.

70.     In *Pengo*, the Fifth Circuit agreed. While acknowledging that OID may be created in a debt-for-debt exchange for accounting and tax purposes, the *Pengo* court emphasized that "this is not a tax case." 962 F.2d at 550. The "tax treatment of original issue discounting," the Court held, "does not control our inquiry, which is placed firmly within the bankruptcy framework." *Id.* "Especially when polestar bankruptcy policy [of incentivizing out-of-court restructurings] militates against doing so, we do not feel compelled to interpret the Bankruptcy Code so as to parallel the tax rules for a transaction." *Id.* at 551.

71.     In *ResCap*, the bankruptcy court reached the same conclusion. It held that even though the debt-for-debt exchange in that case "may have generated OID under the Tax Code, that does not dictate that it created disallowable unmatured interest" under section 502(b)(2). 501 B.R. at 587. Rather, "creation of OID for tax purposes is irrelevant." *Id.*

72.     Plaintiffs appear to argue that notwithstanding the binding case law holding that tax treatment does not govern the section 502(b)(2) question, the Court nonetheless should apply tax principles here because the participants in the December 2024 Exchange agreed to that outcome in the Exchange Agreement. *See* Compl. ¶ 30 ("All Exchange Noteholders consented to the [Exchange Tax Treatment Covenants] and the tax treatment they produced by accepting the Exchange Agreement and participating in the December 2024 Exchange."). This contention is implausible and belied by the agreement.

73.     Section 13(b) of the Exchange Agreement makes unmistakably clear that it pertains only to how the parties would account for the exchange transaction in their tax returns. It specifies that it governs treatment "[f]or all U.S. federal, state and local income tax purposes," and mandates that the exchanging holders "prepare all tax returns in a manner consistent with the Intended Tax Treatment." Exchange Agreement § 13(b).

74.    As with their miscalculation of the applicable cure period for the missed interest payment (*see supra* Part I), Plaintiffs once again disregard the actual language of their contract. The prefatory language to Section 13(b) of the Exchange Agreement is clear that what follows pertains to *tax* OID only; that section says nothing at all about *bankruptcy* OID. Plaintiffs know this. The complaint is replete with admissions that these provisions were included only "for tax purposes."[9] Nowhere in the documents did any person agree to any particular treatment or calculation of OID for bankruptcy purposes. The theory that contractually agreed tax treatment should govern in bankruptcy thus fails as a matter of law.

**B.    Plaintiffs fail to allege the insolvency of the 2027 Note Obligors.**

75.    The central thesis of the complaint is that unamortized OID qualifies as "unmatured interest" that is subject to disallowance under section 502(b)(2). Merely alleging the existence of unamortized OID, however, is not enough to state claim for relief. In *Ultra Petroleum Corp. v. Ad Hoc Comm. of Opco Unsecured Creditors (In re Ultra Petroleum Corp.)*, 51 F.4th 138 (5th Cir. 2022), the Fifth Circuit held that the "solvent-debtor exception" survived enactment of the Bankruptcy Code in 1978. *Id.* at 155–56. Under that doctrine, even if a portion of a creditor's claim is "otherwise disallowed unmatured interest," the creditor still is entitled to payment of that amount. *Id.*

76.    Binding Fifth Circuit case law thus holds that even if section 502(b)(2) would disallow a portion of Defendants' claims as unmatured interest, if any of the 2027 Note Obligors

---

[9]    *See, e.g.*, Compl. ¶ 29 ("For *accounting and tax purposes*, this discount is recognized as OID"), ¶ 31 ("using the Exchange Tax Treatment Covenants, OPI calculated the OID in the December 2024 Exchange for *federal income tax purposes* by applying the rules for determining OID prescribed under sections 1272-1273 of the Internal Revenue Code and the applicable Treasury Regulations"), ¶ 32 ("OPI first determined the 2027 Notes' issue price, which for U.S. *federal income tax purposes* was controlled by the cash consideration paid and the consideration received by the Backstop Commitment Parties."), ¶ 35 ("the Exchange Agreement provides that, *for tax purposes*, the amount of the backstop premium payment allocable to the exercised portion of the December 2024 Exchange would reduce the issue price of the 2027 Notes and stock purchased for cash in the exchange (approximately $33.71 per $1,000 face amount of 2027 Notes))" (emphases added).

is solvent, the claims must be paid in full. That means insolvency of the 2027 Note Obligors is an essential element of Plaintiffs' claim for relief in this action. The complaint, however, does not allege that all the 2027 Note Obligors are insolvent, let alone include any non-conclusory facts sufficient to raise such an inference. The pleading gives Defendants no indication whatsoever of what facts Plaintiffs believe demonstrate insolvency, or even which 2027 Note Obligors the Debtors believe are insolvent, if any.

77.     That is a fatal problem. Under the Bankruptcy Code, any proofs of claim Defendants file based on the 2027 Notes will be *prima facie* valid, and Plaintiffs will bear the burden to "produce evidence sufficient to rebut the presumption of validity and establish that each [c]laim should be disallowed pursuant to § 502(b)." *In re Pearl Res. LLC*, 645 B.R. 530, 545 (Bankr. S.D. Tex. 2022). It therefore was incumbent upon Plaintiffs to plead their insolvency if they wanted to obtain a declaration that they are not required to pay unamortized OID under section 502(b)(2). *Cf., e.g.*, *In re Firestar Diamond, Inc.*, 654 B.R. 836, 897 (Bankr. S.D.N.Y. 2023) (fraudulent transfer plaintiff's failure to allege insolvency requires dismissal).

78.     "Dismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief." *Rios v. City of Del Rio*, 444 F.3d 417, 421 (5th Cir. 2006) (quoting 2A Moore's Federal Practice ¶ 12.07 [2.–5] at 12–91); *see, e.g.*, *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 767 (5th Cir. 2016) (plaintiff's own performance under a contract is a necessary element of a claim for breach, and failure to plead this fact results in dismissal). "If a [c]omplaint omits facts concerning pivotal elements of the pleaders' claim, the court is justified in assuming the nonexistence of such facts." *Ledesma ex rel. Ledesma v. Dillard Dep't Stores, Inc.*, 818 F. Supp. 983, 984 (N.D. Tex. 1993).

79.     This is no mere technicality. A defendant is entitled to notice of the factual basis of the claims against it. *See, e.g.*, *Twombly*, 550 U.S. at 555 (a complaint must be sufficiently detailed to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957))). And a plaintiff, when asserting claims, is bound by the strictures of Rule 9011. That rule provides that whenever a pleading is submitted to the Court, the person signing it is deemed to have certified that "to the best of the person's knowledge, information, and belief . . . the allegations and factual contentions have evidentiary support." Fed. R. Bankr. P. 9011. Plaintiffs should be held to this standard: if they want an order of disallowance under section 502(b)(2), they should be required to conduct the investigation necessary to determine if there is an evidentiary basis to plead insolvency, a prerequisite to that relief.

80.     Yet there is reason to believe Plaintiffs do not want to run the Rule 9011 gauntlet. They began these chapter 11 cases by submitting a proposed DIP facility and RSA that presumed many of the 2027 Note Obligors—especially the 2027 Unsecured Obligors—are solvent, such that the value of these entities can be made available for their equity owner, the parent-level Debtor, ownership of which will then be delivered to the DIP lender through an equitizing chapter 11 plan. Such a DIP facility and plan would make no sense if the Debtors believed all the 2027 Note Obligors are insolvent; in that case, there would be no value to flow up to the parent.

81.     The Debtors have to make a choice. They cannot assume solvency for purposes of one proceeding and insolvency for purposes of another, just because this happens to suit their litigation interests. If they do not or cannot certify to the Court, consistent with Rule 9011, that there is evidentiary support for an allegation of insolvency of the 2027 Note Obligors, the complaint must be dismissed.

**III.     The request to be relieved from *res judicata* should be rejected.**

82.     Plaintiffs' final prayer for relief seeks a declaration that by prosecuting this adversary proceeding, Plaintiffs will not be bound by preclusion principles and instead will be permitted to pursue serial litigation against Defendants over the same set of facts and issues—namely, the December 2024 Exchange, the 2027 Notes, and how much of Defendants' claims should be allowed. This is a request to engage in claim splitting or otherwise be relieved of the consequences of *res judicata*. It should be denied.

83.     The doctrine of claim preclusion—which applies in bankruptcy cases—prevents a plaintiff from litigating a claim to judgment and then raising another claim based on the same circumstances against the same defendant in a subsequent suit. *E.g.*, *Howe v. Vaughan (In re Howe)*, 913 F.2d 1138, 1144 (5th Cir. 1990). It bars not just claims that were actually litigated, but also claims that could and should have been brought in the earlier suit because the actions were based "on the same nucleus of operative facts." *Id.*

84.     The related rule against claim splitting prevents a plaintiff from bringing successive litigations based on the same facts and circumstances, regardless of whether a final judgment has been entered on the merits in the first suit. *E.g.*, *Welsh v. Hester*, 2025 WL 1410009, at *9–10 (5th Cir. May 15, 2025). "Claim splitting occurs when a plaintiff splits 'a single cause of action or claim' by 'advancing one part in an initial suit and attempting to reserve another part for a later suit.'" *Bank of N.Y. Mellon v. Riley*, 2022 WL 1773364, at *3 (5th Cir. June 1, 2022) (quoting *Texas Emps.' Ins. Ass'n v. Jackson*, 862 F.2d 491, 501 (5th Cir. 1988)). The rule prohibiting claim splitting "primarily serves 'to protect the defendant from being harassed by repetitive actions based on the same claim.'" *Gen. Land Off. v. Biden*, 71 F.4th 264, 270 (5th Cir. 2023) (quoting *Super Van, Inc. v. City of San Antonio (In re Super Van, Inc.)*, 92 F.3d 366, 371 (5th Cir. 1996)).

85.     There is no good reason to let Plaintiffs have multiple bites at the apple. To the contrary, it is evident that Plaintiffs are engaging in the type of gamesmanship—and trying to impose on Defendants the kind of prejudice—that *res judicata* principles prevent. Plaintiffs assert that the Special Committee is investigating whether there are other bases to attack Defendants' claims, other than under section 502(b)(2), and that this determination should not be "rush[ed]." Compl. ¶ 47. But they have admitted to the Court that they want to resolve the section 502(b)(2) issue now precisely because this is essential to their determining how much negotiating leverage they have against the Defendants in connection with plan confirmation. Dkt. 7 ¶ 28 (seeking an expedited schedule of this action because it "will inform negotiations with creditors and counterparties"). Plaintiffs have thus conceded that they are splitting their claims to gain a tactical benefit: they want to run one argument and see if it works to give them their desired advantage in plan negotiations; if not, they want the freedom to pivot to another argument and see if that gives the advantage the first one did not. Defendants, meanwhile, will have to go through these chapter 11 cases uncertain of when Plaintiffs' barrage of litigation will end.

86.     Allegations that the Special Committee needs more time ring hollow. The Special Committee was established more than seven months ago, in June 2025, and it has been conducting its investigation since that time. Castellano Decl. ¶¶ 27, 102. The facts and circumstances that gave rise to the 2027 Notes occurred more than a year ago, in December 2024, and have been available to the Special Committee since its formation. Meanwhile, the Special Committee to which Plaintiffs want to give more time is the same one that committed the Debtors to the RSA and proposed DIP facility, which mandated that this action be brought at the start of the chapter 11 cases and pursued on an expedited basis. Everything about the timing of the investigation and this lawsuit has been wholly within the control of Plaintiffs and their Special Committee. Given this,

nothing about the investigation can be characterized as unduly "rushed." That belies Plaintiffs' true intentions in asking for permission to split claims.

87.     Plaintiffs' improper motive is underscored by the dynamics of the chapter 11 cases. Plaintiffs do not want to bring fraudulent transfer claims against Defendants today because they know this could backfire on them and their ally, the September 2029 Ad Hoc Group. While the RSA presumes the 2027 Unsecured Obligors are solvent, which would nullify a fraudulent transfer claim involving those Debtor entities, it presumes that the September 2029 Note obligors are insolvent, which means the September 2029 Ad Hoc Group is especially vulnerable to an avoidance challenge. By asking to reserve avoidance claims for another day, Plaintiffs are trying to ensure that if their alliance with the September 2029 Ad Hoc Group breaks down—for example, if they lose this action and can no longer pursue the plan envisioned by the RSA—they will have another chance to attack Defendants under these different circumstances. That is not fair play.

88.     If Plaintiffs believe there are multiple grounds to disallow Defendants' claims, they should be held to the same standard as any other plaintiff in federal court and not be afforded special treatment just because they filed for bankruptcy and agreed to an RSA and DIP facility premised on a speedy resolution of only a subset of issues. They should bring all challenges based on the same facts against Defendants in a single action, or else live with the consequences of claim preclusion. *See, e.g.*, *In re Wotkyns*, 274 B.R. 690 (Bankr. S.D. Tex. 2002) (claim preclusion principles prohibit debtor from serially objecting to creditor's proof of claim on multiple grounds).

## **CONCLUSION**

89.     For the foregoing reasons, the complaint should be dismissed with prejudice, and Defendants should be granted such other relief as is just and proper.

Respectfully submitted this 23rd day of January 2026.

**PORTER HEDGES LLP**

*/s/ John F. Higgins*
John F. Higgins (TX Bar No. 09597500)
Eric M. English (TX Bar No. 24062714)
Megan Young-John (TX Bar No. 24088700)
James A. Keefe (TX 24122842)
Joanna D. Caytas (TX Bar No. 24127230)
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
Email:   jhiggins@porterhedges.com
            eenglish@porterhedges.com
            myoung-john@porterhedges.com
            jkeefe@porterhedges.com
            jcaytas@porterhedges.com

-and-

**MILBANK LLP**
Dennis F. Dunne (*pro hac vice*)
Andrew M. Leblanc (*pro hac vice*)
Abhilash M. Raval (*pro hac vice*)
Michael W. Price (*pro hac vice*)
Alexander Lees (*pro hac vice*)
Brian Kinney (*pro hac vice*)
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Email:   ddunne@milbank.com
            aleblanc@milbank.com
            araval@milbank.com
            mprice@milbank.com
            alees@milbank.com
            bkinney@milbank.com

*Counsel to the 2027 Ad Hoc Group*

**ARENTFOX SCHIFF LLP**
Andrew I. Silfen (NY Bar No. 2094076)
Beth M. Brownstein (NY Bar No. 4753638)
Nicholas A. Marten (NY Bar ID No. 5032545)
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
Tel: (212) 484-3900
Fax: (212) 484-3990
Email:  Andrew.Silfen@afslaw.com
            Beth.Brownstein@afslaw.com
            Nicholas.Marten@afslaw.com

-and-

Justin A. Kesselman (MA Bar ID No. 687793)
800 Boylston Street, 32nd Floor
Boston, MA 02199
Tel: (617) 973-6100
Email:   Justin.Kesselman@afslaw.com

*Counsel for UMB Bank, N.A., Solely in its Capacities as Indenture Trustee and Collateral Agent under the March 2027 Notes Indenture*

- 36 -

## <u>Certificate of Service</u>

I certify that on January 23, 2026, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/  John F. Higgins*

John F. Higgins
